UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MAURICE B. MURRAY,

          Petitioner,

    v.

S. SHERMAN, Warden,

          Respondent.

Case No. 14-cv-02436-HSG (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY**

      Before the Court is the above-titled petition for a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254 by petitioner Maurice B. Murray, challenging the validity of his state court sentence.  Respondent has filed an answer to the petition.  Petitioner has not filed a traverse, and the deadline to do so has passed.  For the reasons set forth below, the petition is denied.

## I. BACKGROUND

      By amended information filed August 18, 2009, the Monterey County District Attorney charged Petitioner with two counts of lewd acts on a child, Cal. Penal Code § 288(a).  The information further alleged that Petitioner committed an offense against more than one victim, *id.* at § 667.61.  *See* Respondent's Exh. H at 47–50[1] (Clerk's Transcript [*hereinafter* "CT"]).

      On September 8, 2010, the jury found Petitioner guilty on both counts, and found that Petitioner had committed the offenses against more than one victim.  CT 147–49, 152.

      On February 1, 2011, the trial court sentenced Petitioner to fifteen years to life for each count, to be served consecutively, for a total unstayed term of 30 years to life in state prison.  CT 181.

---

[1] In referring to the Clerk's Transcript, the Court refers to the Bates numbers stamped in the bottom right-hand corner of each page.

On April 21, 2012, the California Court of Appeal affirmed Petitioner's judgment on appeal in an unpublished decision.  *People v. Murray*, No. H036588, 2012 WL 1201056 (Cal. Ct. App. 2012).  On June 20, 2012, the California Supreme Court denied Petitioner's petition for review.  *See* Respondent's Exh. D.

On November 8, 2012, Petitioner filed a petition for a writ of habeas corpus in the Monterey County Superior Court which was denied on February 7, 2013.  *See* Respondent's Exh. E.  On December 2, 2013, Petitioner filed a petition for a writ of habeas corpus in the California Supreme Court, which was denied on February 19, 2014.  *See* Respondent's Exh. F.

On May 27, 2014, Petitioner filed the instant federal petition.  *See* Docket No. 1.  On July 2, 2014, the Court issued an order to show cause.  *See* Docket No. 7.

## II. FACTUAL BACKGROUND

At the time of the offenses, Petitioner was recently married to Maria.[2]  *See* RT 2151.  Maria's grandchildren regularly slept over at her house.  *See* Respondent's Exh. H at 2118 (Reporter's Transcript [*hereinafter* "RT"]).  On two separate occasions, Petitioner fondled Maria's granddaughters, Jessica and Marissa,[3] as they were sleeping.

Jessica was eleven years old at the time of the offenses, but twelve when she testified.  She testified that the first incident took place around Halloween 2008.  That night, Jessica spent the night at Maria's house with her fourteen-year-old sister Alicia, her eight-year-old twin brothers, and her two cousins, Marissa and Adriana.[4]  Her twenty-year-old aunt Jasmine Hernandez, Maria, and Petitioner were also at the house that night.  *See* RT 2116–18.  The children fell asleep in the living room while watching television.  *See* RT 2119.  Jessica was wearing a tank top, jeans, and underwear.  *See* RT 2124.  There was a cover on top of her.  *See* RT 2120.  Jessica was lying on her back on the floor near the couch; Adriana was to her right; and the remaining children had fallen asleep on the couch or the floor.  *See* RT 2120–2121.  Although it was dark in the living

---

[2] Because Maria's last name is not disclosed in the record, the Court refers to Maria by her first name.
[3] The children referenced herein are referred to by their first names in order to protect their privacy.
[4] The ages of Alicia and Jessica's twin brothers are their ages as of the date of Jessica's testimony, and not as of the time of the molestations.

room, there was a night light in the adjoining kitchen. *See* RT 2121.

Jessica was awakened around 1:00 a.m. by Petitioner trying to flip her over. *See* RT 2121. Her eyes opened at this point. *See* RT 2122. She was scared and tried to move around. *See* RT 2122. Petitioner put his hand under her pants and on top of her underwear and began rubbing her vagina.[5] *See* RT 2124, 2137. Petitioner kept rubbing for what seemed like a long time, more than a minute. *See* RT 2126. Jessica tried to flip onto her belly so that Petitioner would not touch her, but Petitioner kept flipping her back. *See* RT 2126. She tried to wake Adriana but was unable to do so. *See* RT 2126. Jessica was eventually able to get on her stomach. *See* RT 2127. Then Hernandez, her aunt, opened her bedroom door to go to the bathroom. *See* RT 2127. Petitioner got up fast and went towards Maria's bedroom. *See* RT 2128. Jessica got scared, moved closer to her cousin, and wanted to cry. *See* RT 2128. Jessica thought that Petitioner also touched her chest while she was sleeping because, when she woke up the following day, her chest had "a funky smell," the way that Petitioner smelled. *See* RT 2144–47.

The next morning neither she nor Petitioner spoke to each other. *See* RT 2159. Jessica told Adriana about Petitioner touching her, but did not tell anyone else until a subsequent incident involving Marissa. *See* RT 2152.

Jessica testified that, even prior to the October 2008 incident, she did not like Petitioner. *See* RT 2157–58. She stated that it was in part because she did not really know him, and in part because she thought her grandmother married him too quickly. *See* RT 2151, 2155. She testified that she only hugged Petitioner or kissed him on the cheek when Maria made her. *See* RT 2151– 52. She stated that she was happy that her grandmother married Petitioner because that was the first time she had seen her grandmother "really, really happy." *See* RT 2155.

The second incident took place sometime around Thanksgiving 2008. *See* RT 2129. On that night, Jessica, Marissa, Jessica's two brothers, and their cousin, Armando, were sleeping in the living room. *See* RT 2160, 2213. The television was turned off. *See* RT 2215. The living room was not completely dark because there was a night light in the adjoining kitchen that shined

---

[5] Jessica referred to her vagina as her "private part." *See* RT 2137.

light into the living room.  *See* RT 2139.  Marissa was wearing a t-shirt, jeans, and underwear.  *See* RT 2216.

Jessica testified as follows regarding the second incident.  Jessica testified that she was sleeping on the couch, and Marissa was sleeping on the floor within arm's reach of Jessica.  *See* RT 2139–40.  Jessica testified that when she woke up, she saw Petitioner sitting right next to Marissa.  *See* RT 2140.  Petitioner pulled the blanket down Marissa's body and then turned to see if Jessica was awake.  *See* RT 2138, 2140.  Jessica quickly closed her eyes and Petitioner continued touching Marissa the same way he had touched Jessica.  *See* RT 2138.  Petitioner opened Marissa's pants and continued touching her.  *See* RT 2142.

When Hernandez opened her bedroom door, Petitioner quickly left for Maria's room.  *See* RT 2142.  Jessica then asked Marissa, "Did you feel that?"  Marissa replied that she had, and Jessica told her that it had been Petitioner.  *See* RT 2142.  Jessica told Marissa to get up because Petitioner might come back.  *See* RT 2142.  Both girls went and told Hernandez.  *See* RT 2142.  Hernandez then went to tell Maria.  *See* RT 2142.  Afterwards, Hernandez, Maria, and Petitioner returned to Hernandez's room where they argued and cried.  *See* RT 2142.

Earlier that night Petitioner had put lotion on Marissa's feet, telling her that it was necessary because her feet smelled.  *See* RT 2149.  Petitioner than tried to put lotion on Jessica's feet, but Jessica refused.  *See* RT 2148.  Petitioner had said "come on," but Jessica again refused and Petitioner said "okay."  *See* RT 2148.

Jessica had slept at Maria's house fifteen or twenty times since Maria married Petitioner.  In all those times, there were only two incidents of fondling.  *See* RT 2170–71.

Jessica testified that the purpose of the trial was to "[g]et her statement" and to "put [Petitioner] away."  *See* RT 2116.  Jessica further testified that she knew the difference between the truth and a lie, and that she was telling the truth.  *See* RT 2153.

Marissa testified as follows regarding the second incident.  Marissa was ten years old at the time of the November 2008 incident but eleven when she testified.  *See* RT 2211.  Marissa testified that as she was about to go to sleep, she saw Petitioner go to the kitchen.  *See* RT 2215.  Petitioner went back towards his room, but then returned to peek through the blinds between the

4

kitchen and the living room. *See* RT 2221. Marissa saw Petitioner return to his room. *See* RT 2221. Marissa "kind of" fell asleep but then noticed Petitioner peeking through the shades again, looking in the children's direction. *See* RT 2222. She next remembered Petitioner coming towards her and kneeling down. She could see him through her half-closed eyes. *See* RT 2223–23, 2227. She then felt two fingers in her mouth, trying to open it. *See* RT 2223–23. Her eyes were closed at this time. *See* RT 2224. She felt scared and tried to close her mouth. *See* RT 2224. The two fingers left and she then felt two "things" on her face. *See* RT 2224. The "things" felt different from fingers and felt soft. *See* RT 2231. Next she felt Petitioner's hand on top of her pants, where her private part is. *See* RT 2232. She moved around so that Petitioner would leave. *See* RT 2233. She next felt Petitioner's hand under her pants. *See* RT 2233. Petitioner proceeded to massage her private parts through her underwear for ten seconds or less. *See* RT 2227, 2233–36. Marissa started moving and squirming around, and managed to get onto her left shoulder. *See* RT 2236. Marissa partially opened her eyes and saw Petitioner leave. *See* RT 2236–37.

Marissa testified that after Petitioner left, she was awake, and she and Jessica got up and talked. *See* RT 2237. Then the girls went to Hernandez's room. *See* RT 2237. Hernandez was asleep and in her bed. *See* RT 2240. The girls woke Hernandez and Marissa started crying. *See* RT 2239–41. Jessica spoke for Marissa because Marissa was crying. *See* RT 2241. Hernandez left and Jessica and Marissa got into Hernandez's bed. *See* RT 2241. Maria, Hernandez, and Petitioner came to Hernandez's room and talked. *See* RT 2241. Petitioner denied doing anything. *See* RT 2241. The next morning, Marissa's parents came, and Marissa talked to them about the incident. *See* RT 2243.

Prior to the incident, Marissa liked Petitioner, got along with him, and would play games with him. *See* RT 2261, 2268. Petitioner had never fondled her or touched her in that manner before. *See* RT 2261–62. She had never been alone with Petitioner prior to that incident. *See* RT 2268. Marissa testified that she was telling the truth and that she was certain that the incident was not a dream. *See* RT 2264–66, 2269.

Twenty-year-old Hernandez testified that Jessica and Marissa were her nieces, and that Maria was her mother and married to Petitioner. *See* RT 2402–03. Jessica testified regarding the

United States District Court
Northern District of California

1     November 2008 incident as follows.  That particular night, her nieces and nephews — Alicia,

2     Jessica, Adrian, Fabian, Adriana, Marissa, and Armando — were sleeping over at Maria's house,

3     as they often did.  *See* RT 2404.  The children usually slept in the living room.  *See* RT 2406.

4     When Hernandez returned home around 10 p.m. that night, all the lights were off.  *See* RT 2414.

5     The first thing she did was to look into the living room to check on her relatives.  *See* RT 2415.

6     Everyone seemed to be asleep.  *See* RT 2415.  Around 1:00 a.m., Hernandez went to get a blanket

7     because she was cold.  *See* RT 2406.  Petitioner was awake at the time and got Hernandez a

8     blanket from Maria's room.  *See* RT 2412–13.  About 20 minutes later, Hernandez was awakened

9     by Jessica and Marissa.  *See* RT 2406.  Both girls were upset.  *See* RT 2407–08.  Marissa was

10    crying; and Jessica was frightened, confused, and sad.  *See* RT 2407.  Jessica said that Petitioner

11    had been touching them.  *See* RT 2409.  Hernandez told the girls to explain again what happened.

12    *See* RT 2409.  Hernandez then told the girls to stay in her room, and she walked to Maria's room.

13    *See* RT 2409.  The door to Maria's room was open.  *See* RT 2409.  Maria was sleeping in the bed.

14    *See* RT 2409–10.  Petitioner was awake and alert, sitting in the computer chair with his laptop.

15    *See* RT 2410.

16          Hernandez woke Maria and told her, "Marissa is crying."  *See* RT 2410.  Petitioner got up

17    and walked down the hallway and then stopped.  *See* RT 2410–11.  Hernandez waited for Maria to

18    get up and then Maria and Hernandez walked to Hernandez's room together.  *See* RT 2411.  Maria

19    sat down on the bed and asked Marissa what was wrong.  *See* RT 2411.  Hernandez and Petitioner

20    were standing in the doorway.  *See* RT 2411.  Hernandez asked Petitioner if he had touched the

21    girls, and Petitioner denied it.  *See* RT 2411.  When Maria asked Petitioner if he had touched the

22    girls, he denied it.  *See* RT 2411.  Hernandez spent the rest of the night in her room with the girls.

23    *See* RT 2412.

24          Hernandez testified that she did not get along with Petitioner and did not think he should

25    be married to her mother.  *See* RT 2419.  She stated that Petitioner acted like a policeman in the

26    house, monitored and criticized her behavior, didn't like her friends, and tried to keep her from

27    engaging in illegal activities.  *See* RT 2419.

28          Thirty-year-old Krizia Gardner testified that her mother, Valerie Jean Mason, had been

6

married to Petitioner when Gardner was a child. *See* RT 2430–31. Petitioner and Mason were married when Gardner was two years old. *See* RT 2432. Petitioner lived with Gardner and her mother in New York from the time Gardner was two years old until she was seven years old. *See* RT 2432. When Gardner was seven, the family moved to California. *See* RT 2432. When Gardner was around seven years old and in second grade, her mother worked a lot and would leave early for work, between 4:00 a.m. to 6:00 a.m., and would work until late at night. *See* RT 2436, 2460. Gardner was home alone with Petitioner a lot. *See* RT 2436. After her mother left for work, Petitioner would take Gardner from her room into his room and make her either touch his penis with her hand or put her mouth upon his penis. *See* RT 2436–38. Petitioner would also frequently offer to help her with her homework if she would kiss him "down there." *See* RT 2438. Gardner would refuse and say that she was fine. *See* RT 2438. Petitioner would then make her go under the table and "suck on his private, his penis" and he would do her homework. *See* RT 2438. Petitioner also used to play hide and seek with Gardner and her younger sister, Asia. *See* RT 2439. Petitioner would make Asia look for Gardner and Petitioner. *See* RT 2439. He would take Gardner to hide in the bathroom tub with the lights off and the shower curtain closed, and he would make Gardner hold his erect penis. *See* RT 2439–41. Outside of these incidents, Petitioner made Gardner suck his penis "a lot of times." *See* RT 2442. Petitioner also had Gardner lay on the bed. He would then play in her vaginal area with his fingers while he had her suck his penis. *See* RT 2446. Petitioner told Gardner that her mother worked really hard and that her mother would not want to hear about Petitioner's actions with Gardner because it would really hurt her mother and make her mother angry with her. *See* RT 2444–45. Gardner recalls that during that time she felt scared and wondered why her father would want to hurt her. *See* RT 2445, 2465. At that time, she believed Petitioner was her biological father. *See* RT 2446.

Gardner eventually told her mother what happened, but she did not go into details. *See* RT 2455. She was interviewed by law enforcement at the time about her allegations. *See* RT 2456. Gardner told law enforcement that her father had done certain things, but she did not recall if she told them details. *See* RT 2457. Her mother sent her and her sister to New York to live with her mother's sister. *See* RT 2448. As she and her sister were getting ready to go to the airport,

1    Petitioner took Gardner into the bedroom, stood her on the dresser, and said that he was sorry for

2    what happened and that he loved her.  *See* RT 2448.  She replied that she loved him too.  *See* RT

3    2448.  That was the last time she saw Petitioner until her court testimony.  *See* RT 2448.

4        On Friday, September 3, 2010, the day after Gardner testified, Petitioner failed to appear

5    for trial.  *See* RT 2701.  The trial court continued the trial to September 7, 2010.  *See* RT 2705.

6    Outside of the jury's presence, the trial court questioned Petitioner's mother, Lucille Wheatley,

7    about her recent interactions with Petitioner.  *See* RT 2707–19.

8        When Petitioner did not appear on September 7, 2010, the trial court heard testimony

9    outside the presence of the jury as to whether Petitioner was voluntarily absent.  Petitioner's

10   friend, Monika Reed-Buesche, testified that Petitioner came by her house on September 3 in the

11   late morning or afternoon.  *See* RT 3008.  Petitioner and Reed-Buesche went out for lunch and had

12   beers later that evening.  *See* RT 3009–10, 3012.  Petitioner spent the night.  *See* RT 3012, 3052.

13   Reed-Buesche then dropped him off downtown near the airport.  *See* RT 2013.  Petitioner left his

14   car at Reed-Buesche's residence.  *See* RT 3053.  Reed-Buesche had the impression that Petitioner

15   was flying to see his brother.  *See* RT 3013.  Petitioner told Reed-Buesche that he was going to be

16   back on Tuesday morning.  *See* RT 3013.  The trial court also heard testimony from an

17   investigator who had attempted to track Petitioner.  *See* RT 3021–24.  After hearing all the

18   evidence, the trial court ruled that Petitioner was voluntarily absent and that it would give a flight

19   instruction.  RT 3207 and 3035.

20       Wheatley testified before the jury regarding Petitioner's failure to appear.  She testified

21   that she last saw Petitioner on September 3, 2010, when he drove her to court.  *See* RT 3041.  As

22   he was dropping her off, Petitioner told her to tell his attorney that he would be right up.  *See* RT

23   3042.  Wheatley had not seen him since.  *See* RT 3042.  Later that night, Petitioner called her,

24   crying, and said, "I'm not going to see my mother again," and "Mommy, I'm going to jail."  *See*

25   RT 3043–45.  Petitioner also told Wheatley that he would be back on Tuesday.  *See* RT 3045.

## III. DISCUSSION

### A.    Exhaustion

28       Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings

8

either the fact or length of their confinement are first required to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. *See* 28 U.S.C. § 2254(b), (c); *Rose v. Lundy*, 455 U.S. 509, 515–16 (1982). The state's highest court must be given an opportunity to rule on the claims even if review is discretionary. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999) (petitioner must invoke "one complete round of the State's established appellate review process.").

In his direct appeal proceedings, Petitioner argued that (1) the trial court had committed prejudicial error by admitting evidence that Petitioner had molested his stepdaughter over 20 years earlier, violating his due process rights under the Fifth and Fourteenth Amendments; and (2) the trial court had committed prejudicial error by excluding evidence regarding the investigation into his stepdaughter's claims and the district attorney's failure to prosecute him based on these claims, citing to *Payne v. Tennessee*, 501 U.S. 808, 824 (1991),[6] and *Chapman v. California*, 386 U.S. 18, 23–24 (1967).[7] *See* Respondent's Exhs. A, B, and D. In his state collateral petition, Petitioner raised thirteen claims of ineffective assistance of counsel and twelve claims of prosecutorial misconduct. *See* Respondent's Exhs. E and F.

In the instant federal petition, Petitioner raises thirteen claims of ineffective assistance of counsel, six claims of prosecutorial misconduct, and two due process claims related to the exclusion of evidence. *See* Docket No. 1. Of these claims, Claim No. 12 (ineffective assistance of counsel for displaying uncertainty as to the exhibit number for the diagram of the children's sleeping locations), Claim No. 15 (prosecutorial misconduct for violating the court order and wrongly instructing the jury how to consider Hernandez's testimony), Claim No. 16 (misstating jury instructions by stating that the jury could convict on the testimony of one witness alone), and

---

[6] In relevant part, *Payne v. Tennessee* holds that the Due Process Clause of the Fourteenth Amendment prohibits the introduction of evidence that is so undly prejudicial that it renders the trial fundamentally unfair. *Payne*, 501 U.S. at 824 (citing *Darden v. Wainwright*, 477 U.S. 168, 179–83 (1986)).

[7] In relevant part, *Chapman v. California* applies a "harmless beyond a reasonable doubt" standard in evaluating constitutional error in admitting highly prejudicial evidence or comments. *Chapman*, 386 U.S. at 23–24.

United States District Court
Northern District of California

1   Claim No. 21 (due process violation for excluding an 1987 letter from Gardner's mother, Valerie

2   Mason)[8] are unexhausted.  None of these claims were presented on direct appeal or during the

3   collateral proceeding.  However, because "it is perfectly clear that [Petitioner has not raised any]

4   colorable federal claim[s]," *Cassett v. Stewart*, 406 F.3d 614, 623–24 (9th Cir. 2005), the Court

5   can and will reach the merits of all the claims presented in the instant federal habeas petition,

6   including the claims that are unexhausted, *see* 28 U.S.C. § 2254(b)(2).

7   **B.      Standard of Review**

8            A petition for a writ of habeas corpus is governed by the Antiterrorism and Effective Death

9   Penalty Act of 1996 ("AEDPA").  This Court may entertain a petition for a writ of habeas corpus

10  "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that

11  he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C.

12  § 2254(a).

13           A district court may not grant a petition challenging a state conviction or sentence on the

14  basis of a claim that was reviewed on the merits in state court unless the state court's adjudication

15  of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable

16  application of, clearly established Federal law, as determined by the Supreme Court of the United

17  States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in

18  light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); *Williams v.*

19  *Taylor*, 529 U.S. 362, 412–13 (2000).  Additionally, habeas relief is warranted only if the

20  constitutional error at issue "'had substantial and injurious effect or influence in determining the

21  jury's verdict.'"  *Penry v. Johnson*, 532 U.S. 782, 795 (2001) (quoting *Brecht v. Abrahamson*, 507

22  U.S. 619, 637 (1993)).

23           A state court decision is "contrary to" clearly established Supreme Court precedent if it

24  "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it

25  "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme]

26  Court and nevertheless arrives at a result different from [its] precedent."  *Williams*, 529 U.S. at

27

28  _____

[8] In referencing Petitioner's claims, the Court uses the numbers assigned to the claims by
Petitioner in his petition.

United States District Court
Northern District of California

405–06.  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  *Id.* at 411.

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence.  "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision."  *Williams*, 529 U.S. at 412.  "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous."  *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003).

## C.    State Court Decision

In the instant federal petition, Petitioner raises thirteen claims of ineffective assistance of counsel (Claim Nos. 1–13); six claims of prosecutorial misconduct (Claim Nos. 14–19); and two claims of due process violations (Claim Nos. 20–21).  Claim No. 20 (exclusion of nonprosecution evidence violated due process) was raised in Petitioner's state court appeal and addressed by the state superior court at that time.  *See* Respondent's Exh. A.  All but four of the remaining twenty claims were raised in Petitioner's state habeas petition filed in the Monterey County Superior Court on November 8, 2012, and denied by the state superior court in a reasoned opinion issued on February 7, 2013. [9]  *See* Respondent's Exh. E.  These same sixteen claims were also presented to the California Supreme Court, and were denied in a summary denial issued February 19, 2014.  *See* Respondent's Exh. F.

The state court decision to which 28 U.S.C. § 2254(d) applies is the "last reasoned decision" of the state court.  Accordingly, this Court looks through the state supreme court's

[9] As discussed above, Claim Nos. 12, 15, 16, and 21 were not presented to the state courts and are unexhausted.  *See* discussion *supra* III.A.

United States District Court
Northern District of California

summary denial and examines the state superior court's denial.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 803–04 (1991).  To determine what level of deference should be accorded the state superior court's decision, the Court must first determine whether the state superior court reached the merits of Petitioner's claims or denied them on procedural grounds only.  If the state superior court denied the claims on the merits, e.g. "on the basis of the substance of the constitutional claim advanced," the state court's decision is entitled to AEDPA deference.  *Lambert v. Blodgett*, 393 F.3d 943, 969 (9th Cir. 2004).  If, however, these claims were denied on procedural grounds, the claims are to be reviewed *de novo*, *Cone v. Bell*, 556 U.S. 449, 472 (2009), unless the procedural bar is an "adequate and independent state ground," *Coleman v. Thompson*, 501 U.S. 722, 729–30 (1991).

The state superior court denied the state habeas petition on four grounds — the *Waltreus* rule;[10] the *Dixon* rule;[11] appellate counsel raised all meritorious claims; and none of Petitioner's arguments could have been successfully raised as prejudicial error on appeal — but did not specify which grounds applied to which claims.[12]  The denial of claims as procedurally barred by the

[10] California's *In re Waltreus*, 62 Cal. 2d 218, 225 (Cal. 1965), provides that "'any issue that was *actually* raised and rejected on appeal cannot be renewed in a petition for a writ of habeas corpus.'"  *Forrest v. Vasquez*, 75 F.3d 562, 564 (9th Cir. 1996) (quoting *In re Harris*, 5 Cal.4th 813, 829 (Cal. 1993)).  A *Waltreus* citation does not bar federal review.  *See Calderon v. U.S. Dist. Ct. for the E. Dist. of Cal.*, 96 F.3d 1126, 1131 (9th Cir. 1996).

[11] California's *In re Dixon*, 41 Cal. 2d 756, 759 (Cal. 1953), provides that to bring a claim in a state habeas corpus action a petitioner must first, if possible, have pursued the claims on direct appeal from his or her conviction unless the claim falls within certain exceptions.  *See Park v. Cal.*, 202 F.3d 1146, 1151 (9th Cir. 2000).

[12] The superior court denied the habeas petition as follows:

> Habeas relief is not available for claims already raised and rejected on appeal unless petitioner demonstrates that one of the very limited exceptions to the rule applies.  (*In re Waltreus* (1965) 62 Cal.3d 218, 225.)  Likewise, habeas corpus will not serve as a substitute for an appeal.  (*In re Dixon* (1953) 41 Cal.2d 756, 759.)  Therefore, claims that could have been but were not raised on appeal will not be considered in a petition for writ of habeas corpus in the absence of petitioner demonstrating an exception to the rule.  (*Ibid.*)

> Here, petitioner points to alleged error that is contained within the record on appeal.  Any arguable error that falls with the record must be raised on appeal.  Appellate counsel reviewed the record and raised those claims he believed to be meritorious.  The Sixth District rejected those contentions, and petitioner has failed to point out any arguments that could have been successfully raised as prejudicial error on appeal.

United States District Court
Northern District of California

1    *Waltreus* rule or the *Dixon* rule would require *de novo* review of those claims.  *See Forrest v.*

2    *Vasquez*, 75 F.3d 562, 564 (9th Cir. 1996) (*Waltreus* denial requires federal courts to look through

3    to previous state court decisions because a "*Waltreus* citation is neither a ruling on the merits nor a

4    denial on procedural grounds"); *Lee v. Jacquez*, 788 F.3d 1124, 1134 (9th Cir. 2015) (*Dixon*

5    procedural bar was not adequate to support the judgment in that it was not clear, consistently

6    applied, and well-established at the time of the petitioner's purported default).  Because the order

7    is ambiguous, this Court will, in an abundance of caution, review *de novo* all the claims in the

8    instant petition, since, if the claims fail under a *de novo* standard of review, they must also fail

9    under AEDPA's more deferential standard.  *See Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010)

10   (where claims fail under *de novo* review, state court's denial of claim must necessarily be found

11   reasonable under AEDPA's more deferential standard).

12   **D.      Petitioner's Claims**

13           **1.      Ineffective Assistance of Counsel Claims**

14                    **a.      Legal Standard**

15           A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth

16   Amendment right to counsel, which guarantees not only assistance, but "effective" assistance of

17   counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  The benchmark for judging any

18   claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning

19   of the adversarial process that the trial cannot be relied upon as having produced a just result.  *Id.*

20   at 686.  In order to prevail on a Sixth Amendment claim based on ineffectiveness of counsel, a

21   petitioner first must establish that counsel's performance was deficient, i.e., that it fell below an

22   "objective standard of reasonableness" under prevailing professional norms.  *Id.* at 687–88.

23   Second, the petitioner must establish prejudice resulting from his counsel's deficient performance,

24   i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result

25

26   _____

27           Based on the foregoing, the petition is DENIED.

28   *See* Respondent's Exh. E, Order at 2.

of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

A federal habeas court considering an ineffective assistance claim need not address the prejudice prong of the *Strickland* test "if the petitioner cannot even establish incompetence under the first prong." *Siripongs v. Calderon*, 133 F.3d 732, 737 (9th Cir. 1998). Conversely, the court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland*, 466 U.S. at 697.

### b.    Claim No. 1

Petitioner's entire statement of his first claim is as follows:

> Trial counsel Mr. Frank Dice provided IAC as noted in the ruling by the 6th District Court of Appeals. Mr. Dice, when given the opportunity to brief one of two documents of a crucial nature, which would have cast very serious doubt over the prosecutors 1108 witness' testimony, he did not do so. (Page 11 of IAC claims.)

Pet. at 6. The Court understands Petitioner to be arguing that he was prejudiced by trial counsel's failure to file supplemental briefing regarding the admissibility of the nonprosecution evidence.[13]

In analyzing an ineffective assistance of counsel claim, the relevant inquiry is not what defense counsel could have done, but rather whether the choices made by defense counsel were reasonable. *See Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998). Judicial scrutiny of counsel's performance must be highly deferential, and a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689. A difference of opinion as to trial tactics does not constitute denial of effective assistance. *See United States v. Mayo*, 646 F.2d 369, 275 (9th Cir. 1981).

After carefully reviewing the record, the Court concludes that, given the governing caselaw and the facts of Petitioner's case, trial counsel's decision to not submit briefing on the nonprosecution evidence did not fall below the *Strickland* standard of reasonable professional judgment. *See*, *e.g.*, *Lowry v. Lewis*, 21 F.3d 344, 346 (1994) (failure to file suppression motion not ineffective assistance where counsel investigated filing motion and no reasonable possibility

---

[13] Contrary to Petitioner's assertion, the state appellate court *agreed* with the trial court's exclusion of the nonprosecution evidence. *See* Respondent Exh. C at 12–13.

United States District Court
Northern District of California

United States District Court
Northern District of California

evidence would have been suppressed).  The relevant case cited by the trial court, *People v. Mullens*, 14 Cal.Rptr.3d 534 (Cal. Ct. App. 2004), at most supported the admissibility of a defendant's *acquittal* of uncharged conduct.  The *Mullens* court held that it was error to exclude evidence of acquittal of an uncharged sex offense admitted under section 1108 of the California Evidence Code.  The *Mullens* court explained that an acquittal helped a jury to weigh the evidence of the prior act, because an acquittal indicated that "that at another time and place a duly constituted tribunal charged with the very issue of determining defendant's guilt or innocence of the other crime concluded that he was not guilty."  *Mullens*, 14 Cal.Rptr.3d at 546 and 549.

However, unlike an acquittal, nonprosecution does not mean that, at another time and place, someone concluded that the defendant was not guilty.  Rather, as the trial court noted – and as both parties acknowledged during the 1108 hearing – there are many reasons why a district attorney's office could choose not to file charges.  RT 1216, 2104.  In this case, Mason, the mother of the victim of the prior acts admitted under section 1108, had written a letter to the district attorney's office expressing her belief in Petitioner's innocence of the uncharged conduct.  The prosecution argued that the district attorney might have chosen not to investigate or file charges in order to respect the family's wishes.  RT 1212.  Under these circumstances, as the trial court found, nonprosecution evidence does not assist a jury in weighing evidence of the prior act in the same manner that acquittal evidence does.

In addition, the trial court found that the nonprosecution evidence was inadmissible under section 352 of the California Evidence Code because it would be time-consuming to examine the reasons why Petitioner was not charged, and because it had the potential to confuse the jury.  The admission of the nonprosecution evidence would have led to the possibility of Mason being called to testify.  At the time of trial, Mason had disavowed the 1987 letter and was available and willing to testify to her belief that Petitioner had committed the uncharged offense.  RT 1211, 1222, 2107, and 2109.[14]  Given the trial court's analysis of the governing caselaw and evidentiary rules and

---

[14] During the sentencing hearing, Mason read Gardner's victim impact statement.  After reading the statement into the record, Mason made a brief statement on her own behalf where she emphasized her belief in Petitioner's guilt of the uncharged crimes:

It's about time.  And I think this is going to — this is going to — it's never a pay back.

15

Mason's potentially damaging testimony, trial counsel reasonably decided to forgo submitting

briefing on the nonprosecution issue after the trial court had heard argument on the issue.

Petitioner has not established that trial counsel's performance fell below an "objective standard of

reasonableness" under prevailing professional norms when trial counsel did not submit briefing on

the nonprosecution issue. *Strickland*, 466 U.S. at 687–88.

   In addition, there is no reasonable probability that the result of the proceeding would have

been different if trial counsel had submitted briefing on the nonprosecution issue. *See Hinton v.

Alabama*, 134 S. Ct. 1081, 1089 (2014) (quoting *Strickland*, 466 U.S. at 694). The trial court had

already denied admission of this evidence once, and that decision was reasonable given the

relevant question raised by Gardner's testimony: whether Petitioner actually *committed* the 1987

acts.[15] Evidence that the district attorney chose, for unspecified reasons, not to *prosecute* him for

the acts had negligible probative value on that question, while posing a substantial risk of waste of

time and confusion of the issues. There is nothing in the record to suggest that filing another brief

would have changed the trial court's ruling. Habeas relief is denied for this claim.

### c.   Claim No. 2

Petitioner's entire statement of his second claim is as follows:

> Trial counsel Mr. Frank Dice admits ineffectiveness to the court. (See page 2178
> of IAC claims.)  Mr. Dice failed to object to a matter regarding the statement of a
> witness, in which he should have, and he admitted as such to the court. (See page
> 2178 of IAC claims.)

Pet. at 6. The exchange in question took place during a sidebar conference. The trial court

---

You can never pay back anything. But it's about time. It's about time that this gentleman
is held accountable for his actions and the hurt and the taunting and how he used to throw
up in my face what he did to my daughter. It's about time.
RT 3607.

[15] The Court also properly instructed the jury, both at the beginning of Gardner's testimony and
prior to closing arguments, that Gardner's testimony was only to be used for a limited purpose,:

> If you conclude that the defendant committed the uncharged offenses, that conclusion is
> only one factor to consider, along with all of the other evidence.  It is not sufficient by
> itself to prove that the defendant is guilty of lewd acts on a child under 14 as charged in
> Counts 1 and 2.  The People must still prove each charge and allegation beyond a
> reasonable doubt.  Do not consider this evidence for any other purpose.

RT 2434 and 3076.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    cautioned the prosecutor to abide by the fresh complaint doctrine[16] and avoid going into details

2    about any complaints made about inappropriate touching.  *See* RT 2177–78.  The prosecution

3    acknowledged the warning and stated that he sought to introduce Jessica's testimony that she

4    directly observed Petitioner touching Marissa as a personal observation, which would not violate

5    the fresh complaint doctrine.  *See* RT 2178.  The trial court agreed that Jessica's observation of

6    Petitioner was admissible.  *Id.*  Trial counsel responded, "I think the Court is right in what you just

7    said.  And I would ask the Court to give them a brief — the jury a statement that the complaints

8    are only — I should have objected in the first place."  *Id.*

9         Petitioner's claim is premised on a misreading of the record and on a misunderstanding of

10    what constitutes effective assistance of counsel.  Trial counsel's passing suggestion that he could

11    have, or should have, pursued alternative trial tactics is not an admission of ineffective assistance.

12    Nor is such a comment sufficient, by itself, to satisfy the burden of showing through evidentiary

13    proof that trial counsel was not functioning as the counsel guaranteed by the Sixth Amendment.

14    *See Toomey v. Bunnell*, 898 F.2d 741, 743 (9th. Cir. 1990) (citing *Strickland*, 466 U.S. at 687).

15         Moreover, a review of the record shows that, in this particular situation, despite trial

16    counsel's statement, there was no need for trial counsel to object during the prosecution's direct

17    examination of Jessica.  The relevant portion of the prosecutor's direct examination of Jessica was

18    brief and did not violate the fresh complaint doctrine, *see* RT 2152, and was followed soon

19    thereafter by the court's instruction to the jury that Jessica's testimony was admissible only for the

20    limited purpose "to show that a complaint was made and the circumstances under which the

21    complaint was made" and could not "be used for the truth of the matter stated," *see* RT 2181.

22         In sum, Petitioner was not prejudiced by trial counsel's failure to object during Jessica's

---

[16] Under the fresh-complaint doctrine, "evidence that the alleged victim of a sexual offense disclosed or reported the incident to another person shortly after its occurrence has been held admissible, as part of the prosecution's case-in-chief, in a subsequent criminal prosecution for that offense."  *People v. Brown*, 8 Cal. 4th 746, 748 (1994). However, "evidence of the victim's report or disclosure of the alleged offense should be limited to the fact of the making of the complaint and other circumstances material to this limited purpose." *Id.* at 763.  This limitation is required to "eliminat[e] or at least minimiz[e] the risk that the jury will rely upon the evidence for an impermissible hearsay purpose," that is, "as tending to prove the truth of the underlying [sexual offense] charge . . ." *Id.* at 762–63.

direct examination.  *See*, *e.g.*, *Strickland*, 466 U.S. at 697 (the Court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies").  Because Petitioner cannot show prejudice, the Court declines to consider whether trial counsel's failure to object constituted deficient performance.  *See Strickland*, 466 U.S. at 697; *see also Williams v. Calderon*, 52 F.3d 1465, 1470 & n.3 (9th Cir. 1995).  This habeas claim is denied.

### d.    Claim No. 3

Petitioner's entire statement of his third claim is as follows:

> Trial counsel admits to the court and a witness on the stand the [sic] "Sometimes I'm not entirely clear."  Mr. Dice asked the witness to "do your best to answer my question if you can."  (See page 2243 of IAC Claims)

Pet. at 6.  Again, Petitioner reads too much into trial counsel's statements.  Trial counsel's mildly self-deprecating comments about the clarity of his questions are not admissions of poor performance.  Nor do such unremarkable comments meet the standard for ineffective assistance as set forth in *Strickland*.

In addition, the record does not support a finding that these two statements so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result, which is the benchmark for judging any claim of ineffectiveness of counsel.  *Strickland*, 466 U.S. at 686.  In the unlikely event that these two statements undermined the jury's confidence in, or trust regarding, trial counsel, it is speculative to conclude that the jury's evaluation of trial counsel's performance was a factor in the verdict.

Moreover, there was ample evidence supporting Petitioner's conviction.  Both Jessica and Marissa testified that Petitioner fondled them.  Jessica also testified that she witnessed Petitioner fondling Marissa.  The girls' aunt, Hernandez, testified that Jessica and Marissa told her about Petitioner fondling Marissa soon after it happened.  Finally, Petitioner voluntarily failed to appear for trial, *see* RT 3027–29, and the trial court properly instructed that his flight could show awareness of guilt, *see* RT 3029–35, 3070.  Petitioner has not shown that, but for these statements by trial counsel, there is a reasonable probability that the result of the proceeding would have been different.  *Strickland*, 466 U.S. at 694.  Habeas relief is denied for this claim.

1

        **e.**     **Claim No. 4**

2

Petitioner's entire statement of his fourth claim is as follows:

3

4

> Trial counsel Mr. Frank Dice was addressed by the court about his line of questioning because it "didn't make since [sic] to the court/judge.  Mr. Dice's response to the court was "I'm trying to simplify it and I'm making it worse."  (See page 2246 of IAC Claims).

5

6

Pet. at 8.  This claim is again based upon Petitioner's mistaken belief that any self-deprecating

7

statements made by trial counsel are admissions of ineffective assistance, and that any arguable

8

error by trial counsel, such as asking a confusing question, constitutes ineffective assistance of

9

counsel.  Petitioner is incorrect.  Under the *Strickland* standard, the Sixth Amendment right to

10

counsel is only violated where counsel's conduct undermines the proper functioning of the

11

adversarial process such that the trial cannot be relied upon as having produced a just result.

12

*Strickland*, 466 U.S. at 686.   A self-deprecating comment is not error, much less prejudicial error.

13

Here, although the trial court was confused by trial counsel's question, there is no indication that

14

either the witness or the jury was confused by the question, or that trial counsel lacked the cross-

15

examination skills to properly play his adversarial role.  Trial counsel ultimately managed to elicit

16

from Marissa the information he was seeking (Marissa's position in the room at the time of the

17

November incident), and used this information in his closing argument to cast doubt on the

18

accuracy of Marissa's testimony.  *See* RT 2246–51, 2415–17, and 3101.  The challenged line of

19

questioning was not an instance of counsel's representation falling below an objective standard of

20

reasonableness.  *Strickland*, 486 U.S. at 687–88.  Nor has Petitioner made a showing that if

21

counsel had framed this line of questioning some other (unspecified) way, there is a reasonable

22

probability that the result of the proceeding would have been different.  *Id.* at 694.  Habeas relief is

23

denied on this claim.

24

        **f.**     **Claim No. 5**

25

Petitioner's entire statement of his fifth claim is as follows:

26

> The court had to clarify a line of questions by Mr. Dice with regard to his presentation of the question.

27

28

> (By the court) "Well, let me --- what Mr. Dice is asking you, was your head closer to the couch or away from the couch?".  (See page 2248 of IAC Claims).

United States District Court
Northern District of California

Pet. at 8.  The trial court's follow-up question does not, by itself, prove that trial counsel's representation fell below an objective standard of reasonableness.  Moreover, the record shows that, following the court's attempt at clarification, trial counsel was ultimately able to elicit the information sought.  *See* RT 2247–48.  Petitioner has not made a showing that the trial court's follow-up question proves that trial counsel's representation fell below an objective standard of reasonableness.  Habeas relief is denied on this claim.

### g.     Claim No. 6

Petitioner's entire statement of his sixth claim is as follows:

> The court again had to address trial counsel Mr. Dice as to his questioning.
>
> (By the court) "Well why don't we ask one question at a time.  Mr. Dices' [sic] response, "Absolutely I'm sorry.  It was my fault."  (See page 2254 of IAC Claims).

Pet. at 8.  This claim is also based upon a misunderstanding of what constitutes ineffective assistance of counsel.  That the trial court addressed trial counsel's manner of questioning and that trial counsel stated "It was my fault" do not, by themselves, prove that trial counsel's representation fell below an objective standard of reasonableness.  Similar to Claims No. 4 and 5, despite the trial court's statements, trial counsel's cross-examination was ultimately successful.  Here, he ultimately elicited from Marissa that her eyes were closed the first time Petitioner came into the living room, that she did not see him, and that she only felt him enter.  *See* RT 2255.  Trial counsel's representation did not fall below an objective standard of reasonableness, *Strickland*, 466 U.S. at 688, and there is no reasonable probability that, absent this error, the jury would have had a reasonable doubt concerning his guilt, *Hinton*, 134 S. Ct. at 1089.  Habeas relief is denied on this claim.

### h.     Claim No. 7

Petitioner's entire statement of his seventh claim is as follows:

> Mr. Dice (trial counsel) admits to the jury, during closing arguments, that he was "ineffective."
>
> When addressing the jury during closing arguments, Mr. Dice stated to the jury, "I mean, I certainly didn't ask any particularly 'effective' questions when she testified".  Referring to the prosecutors witness.  He states, "I plead guilty to that." (See page 3100 of IAC Claims)

Pet. at 8.  As discussed *supra*, self-deprecating statements by trial counsel are insufficient to show that trial counsel's performance was deficient.  Moreover, Petitioner has taken trial counsel's statement out of context.  Trial counsel's tactical decision to say that he did not ask "effective" questions was not intended to suggest his ineffectiveness to the jury.  Rather, trial counsel made this statement because he asked the jury to shift their focus from Gardner's credibility (which had been the emphasis of his cross-examination) to the relevance and probative weight of Gardner's testimony.[17]  Trial counsel's representation did not fall below an objective standard of reasonableness, *Strickland*, 466 U.S. at 688, and there is no reasonable probability that, absent this statement, the jury would have had a reasonable doubt concerning Petitioner's guilt, *Hinton*, 134 S. Ct. at 1089.  Habeas relief is denied on this claim.

### i.      Claim No. 8

Petitioner's entire statement of his eighth claim is as follows:

> Mr. Dice admits to the court that he should have made an objection a 'day before' with regards to evidence.  However the court replied 'it was too late.'

---

[17]  In relevant part, trial counsel argued as follows in his closing argument:

> Now, the hardest thing I think to deal with here in terms of how you analyze it, if we're talking about the evidence, is Krizia's testimony.  I think it's irrelevant – strike that, irrelevant.  It's not important really that she came from New York here.  I mean, that's what witnesses do.  Was her testimony compelling?  I'm not up here to say it wasn't.  I mean, I certainly didn't ask any particularly effective questions when she testified.  I plead guilty to that.  But the question then comes what do you use it for?  What do you use it for?

> The Prosecutor says this shows the propensity, this shows this man's overwhelming compulsion, that he couldn't stop doing this.  Well, this – these acts happened, if they did, and I think it wouldn't be crazy to say by a preponderance of the evidence, let's be truthful here, that they happened.  They happened in 1983, '84, '85, '87.  That's a long time ago.  That's a long time ago.  Does it excuse it?  Does it make it good?  No, but it is a long time ago.

> What happened between 1987, when Krizia talked to somebody in law enforcement, and now?  What happened?  We have 15 or 20 sleepovers at least, where children are there, exposed to all this, and nothing happened.  We have that.  And then we're talking about a long period of time where this overwhelming compulsion never shows up.

*See* RT 3100–01.

21

1

> Mr. Dice stated to the court, "I didn't object yesterday. I probably should have. The courts response was "I'm not sure what I would have done had there been a timely objection. But it's to [sic] late now. (See page 3301 of IAC Claims)

2

3  Pet. at 8. In this claim, Petitioner argues that trial counsel's failure to raise a

4  contemporaneous objection to the prosecution's use of photos of Jessica and Marissa in

5  closing argument constituted ineffective assistance of counsel. Trial counsel's post-hoc

6  reconsideration of trial tactics does not, by itself, constitute ineffective assistance of

7  counsel. Moreover, here, the trial court indicated that it would likely have denied the

8  objection. *See* RT 3301–02. In addition, there was significant evidence of Petitioner's

9  guilt. *See* discussion *infra* Section III.D.1.d. Accordingly, trial counsel's failure to raise a

10  contemporaneous objection does not show that his representation fell below an objective

11  standard of reasonableness, or that Petitioner was prejudiced by the failure. *See, e.g.,*

12  *Weygandt v. Ducharme,* 774 F.2d 1491, 1493 (9th Cir. 1985) (defense counsel's failure to

13  object to prosecutor's improper remarks did not prejudice defendant in light of

14  overwhelming evidence of guilt presented at trial). Habeas relief is denied on this claim.

15  **j.      Claim No. 9**

16  Petitioner's entire statement of his ninth claim is as follows:

17  > Mr. Dice is again addressed by the court with his line of questioning. (Twice)

18  > After being addressed by the court twice, Mr. Dices' [sic] response was, "I'm getting old, but I thought I said that" (See pages 2256-2258 of IAC Claims)

19

20  Pet. at 8. Again, Petitioner argues that trial counsel was ineffective because the trial court

21  twice addressed his manner of cross-examination. However, when this exchange is read in

22  context, it is clear that the trial court mistakenly thought that trial counsel had been unclear

23  as to how Marissa should time the encounter. The record does not support a finding that

24  trial counsel's cross-examination was deficient under prevailing professional norms.

25  *Strickland,* 466 U.S. at 687–88. Habeas relief is denied for this claim.

26  **k.      Claim No. 10**

27  Petitioner's entire statement of his tenth claim is as follows:

28  > Trial counsel failed to address prosecutors witness as to her testimony of events

United States District Court
Northern District of California

1

2

3

> while she was 'sleeping.'
>
> The prosecutors witness Jasmine Hernandez gave a detailed testimony as to who was sleeping where, and with what, and she stated "I wasn't aware exactly (where) they were.  I was sleeping."  (See page 2417 of IAC Claims)

4    Pet. at 9.  Petitioner argues that trial counsel should have challenged Hernandez's credibility by

5    emphasizing that Hernandez was asleep during the November incident and therefore could not

6    have known where the children were sleeping in the living room.  Petitioner mischaracterizes

7    Hernandez's testimony.  Hernandez was testifying as to her general impression as to where the

8    children were sleeping in the living room.  She did not claim to be certain of the children's

9    sleeping locations.  On re-direct, she stated that she only glanced into the living room, *see* RT

10   2424, and she agreed that she was not taking an inventory of where the children were situated, *see*

11   RT 2423.

12        In addition, trial counsel used Hernandez's testimony to undermine Jessica's account of the

13   relevant events.  Hernandez's testimony was inconsistent with Jessica's testimony.  During cross-

14   examination, Hernandez testified that her nephews were sleeping on the couch and her nieces were

15   sleeping on the floor.  *See* RT 2415.  However, Jessica testified that she was sleeping on the couch

16   and Marissa was sleeping on the floor, thereby casting doubt on the accuracy of Jessica's

17   recollection.  In closing argument, trial counsel emphasized the conflicting testimony to point out

18   that the events in question "happened quite a while ago," and if the jury assumed that Jessica

19   incorrectly recalled the placement of the children in the living room on that night in November

20   2008 because of the time passed, the same concern could be applied to Jessica's recollection of the

21   relevant events.  *See* RT 3101.[18]  A difference as to trial tactics does not constitute denial of

22   effective assistance.  *See Mayo*, 646 F.2d at 375.  Trial counsel performed reasonably in not

23   challenging Hernandez's credibility on cross-examination in order to challenge the reliability of

24

25   ─────────────────────
     [18] In relevant part, trial counsel stated in closing argument:

26        And if you will recall, [Hernandez] places the children in an entirely different position on the diagram in People's 2. . . .It's totally inconsistent with what [Jessica] said.  Now, you

27        say, well, how can [Hernandez] remember that?  Maybe she didn't get it right.  But she's here, just like everybody else, talking about something that happened quite a while ago, and her testimony is as credible as anybody else's.

28   RT 3101.

United States District Court
Northern District of California

United States District Court
Northern District of California

the victim's memories.  *Cf. Bell v. Cone*, 535 U.S. 685, 701–02 (2002) (not unreasonable for state court to hold decision to waive closing argument in penalty position of capital case was competent tactical decision, when waiver prevented "very persuasive" prosecutor from arguing).  This habeas claim is denied.

### l.        Claim No. 11

Petitioner's entire statement of his eleventh claim is as follows:

> There were two occasions in which the court had to address trial counsel to move on to other areas with regards to his questioning.

> Pages 2273, lines 9-11, and page 2274, lines 7-8 both support this claim addressing the trial counsel.

Pet. at 9.  Petitioner is referring to two instances during trial counsel's cross-examination of Marissa where the trial court urged trial counsel to move on to another topic.  Again, the fact that the trial court commented on trial counsel's manner of cross-examination is not enough, by itself, to establish deficient performance in violation of the Sixth Amendment.  This habeas claim is denied.

### m.        Claim No. 12

Petitioner's entire statement of his twelfth claim is as follows:

> While addressing the jury during closing arguments, trial counsel describes what he "thinks" was the peoples evidence.  Displaying a degree of "uncertainty."

> Trial counsel stated to the jury during closing, "People's 2 is the diagram of  --- or I think it's People's 2 where they drew all the children where they were --- ---" (See page 3101 of IAC Claims)

Pet. at 9.  Trial counsel was expressing his uncertainty as to the number of the exhibit; he was not expressing confusion as to what evidence had been presented by the prosecution.  *See* RT 3101. Trial counsel's statement did not cause his performance to fall below an "objective standard of reasonableness."  *Strickland*, 466 U.S. at 687–88.  Nor is there a reasonable probability that but for trial counsel's statement, Petitioner would have been acquitted.   As discussed above, there was significant evidence of Petitioner's guilt.  *See* discussion *infra* Section D.1.d.  This habeas claim is denied.

### n.        Claim No. 13

1    Petitioner's entire statement of his thirteenth claim is as follows:

2        Trial counsel again admits his ineffectiveness to the court.

3        Trial counsel Mr. Dice states to the court, "I just wanted to object. I realize my
         objection is not timely to the argument. It would be timely to the rebuttal I
4        suppose". (See page 3302 of IAC Claims).

5    Pet. at 6. As discussed *infra*, trial counsel's every change of heart with regard to trial tactics does

6    not, by itself, constitute ineffective assistance of counsel. Trial counsel's evaluation of his own

7    performance was not the dispositive factor in determining whether a Sixth Amendment violation

8    has taken place. Trial counsel's failure to raise a contemporaneous objection does not show that

9    counsel's representation fell below an objective standard of reasonableness. Nor has Petitioner

10   made a showing that he was prejudiced by the failure. Habeas relief is denied on this claim.

11       **2.       Prosecutorial Misconduct Claims**

12           **a.       Legal Standard**

13   Prosecutorial misconduct is cognizable in federal habeas corpus. The appropriate standard

14   of review is the narrow one of due process and not the broad exercise of supervisory power.

15   *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). A defendant's due process rights are violated

16   when a prosecutor's misconduct renders a trial "fundamentally unfair." *Id.* at 193; *Smith v.*

17   *Phillips*, 455 U.S. 209, 219 (1982) ("the touchstone of due process analysis in cases of alleged

18   prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor"). Under

19   *Darden*, the first issue is whether the prosecutor's remarks were improper; if so, the next question

20   is whether such conduct infected the trial with unfairness. *Tan v. Runnels*, 413 F.3d 1101, 1112

21   (9th Cir. 2005); *see also Deck v. Jenkins*, 768 F.3d 1015, 1023 (9th Cir. 2014) (recognizing that

22   *Darden* is the clearly established federal law regarding a prosecutor's improper comments for

23   AEDPA review purposes). A prosecutorial misconduct claim is decided "on the merits,

24   examining the entire proceedings to determine whether the prosecutor's remarks so infected the

25   trial with unfairness as to make the resulting conviction a denial of due process." *Johnson v.*

26   *Sublett*, 63 F.3d 926, 929 (9th Cir. 1995) (quoting *Hall v. Whitley*, 935 F.2d 164, 165 (9th Cir.

27   1991)); *see Trillo v. Biter*, 769 F.3d 995, 1001 (9th Cir. 2014) ("Our aim is not to punish society

28   for the misdeeds of the prosecutor; rather, our goal is to ensure that the petitioner received a fair

United States District Court
Northern District of California

25

1    trial.").

2              b.    **Claim No. 14**

3        Petitioner's entire statement of his fourteenth claim is as follows:

4            Prosecutor Rolando Mazariegos committed perjury to the jury during closing
             arguments with regards to the testimony of one of his witnesses.

5

6            The prosecutor told the jury that during the testimony of Jasmine Hernandez, "she
             told us Maurice Murray on November 2008 incident was awake, alert and capable
             of committing the offense in November 2008 incident".  Absolutely nowhere in the
7            testimony of Jasmine . . ., does she make any such statement.  (See page 3304 of
             prosecutor misconduct and perjury.)

8

9    Pet. at 27.  Habeas relief is denied for this claim.  Petitioner's claim is factually incorrect.  The

10   prosecutor accurately summarized Hernandez's testimony.  Hernandez testified that when she

11   went to tell her mother about Jessica's allegations, she found Petitioner alert and awake in Maria's

12   room, *see* RT 2410, and that he had been awake earlier in the night when she had asked for an

13   extra blanket, *see* RT 2412–13.  Although Hernandez did not specifically testify that Petitioner

14   was capable of committing the offense, the prosecutor's characterization is a reasonable inference

15   from her testimony that Petitioner was awake and alert throughout that evening.  *See United States*

16   *v. Blueford*, 312 F.3d 962, 968 (9th Cir. 2002) ("It is certainly within the bounds of fair advocacy

17   for a prosecutor, like any lawyer, to ask the jury to draw inferences from the evidence that the

18   prosecutor believes in good faith might be true.").  The prosecutor's remarks were not improper.

19   This habeas claim is denied.

20             c.    **Claim No. 15**

21       Petitioner's entire statement of his fifteenth claim is as follows:

22           In regards to claim fourteen, the prosecutor violated and disregarded (blatantly), the
             order of the court as to how to use the testimony of the witness Jasmine Hernandez

23

24           The court ruled that the testimony of Jasmine Hernandez is "being admitted for a
             limited purpose only . . . it is admitted for the limited and only for the limited
             purpose of showing that a complaint was made and the circumstances under which
25           the complaint was made."  (See page 2408 of prosecutor misconduct and perjury)

26

27   Pet. at 27.  This habeas claim is also factually incorrect.  Petitioner ignores a key portion of the

28   trial court's limiting instructions.  The trial court did not limit the admissibility of *all* of

United States District Court
Northern District of California

Hernandez's testimony, as Petitioner asserts.  The trial court only limited the admissibility of Hernandez's testimony "as to what either Jessica or Marissa told her."  *See* RT 2408.[19]  The remainder of Hernandez's testimony — including her testimony regarding Petitioner's actions the night of the November incident — was fully admissible.  The prosecutor did not violate any court order when he referenced Hernandez's testimony that Petitioner was wide awake and alert when she went to inform her mother of the allegations made by Jessica and Marissa.  Accordingly, there was no prosecutorial misconduct.  This habeas claim is denied

### d.     Claim No. 16

Petitioner's entire statement of his sixteenth claim is as follows:

> The prosecutor Rolando Mazariegos confused and misled the jury by "again", blatantly disregarding the courts jury instructions.
>
> The prosecutor told the jury during closing arguments that "Remember yesterday I said there was instruction where you can take one person's testimony, and convict the defendant on that.  That is one option.  (See page 3306 of prosecutor misconduct and perjury)
>
> The Court, during its instructions to the jury stated that "If you conclude that the defendant committed the uncharged offense ---- it is not sufficient by itself to prove that defendant is guilty of lewd on the child or the children in this as charged in the case"  (See page 2434 of prosecutor misconduct and perjury, lines 11-16).

Pet. at 27.  Habeas relief is denied for this claim.  Petitioner takes the prosecutor's statement out of context and misconstrues it.  The prosecutor did not urge the jury to convict Petitioner of the charged crimes based on Gardner's testimony regarding the uncharged offenses.  Rather, the prosecutor was reviewing the jury instructions regarding how to evaluate the credibility of witnesses.  The prosecutor correctly stated that Gardner's testimony could be used in evaluating the credibility of other witnesses.[20]  Then, the prosecutor moved on to discuss what kind of proof

---

[19] Hernandez's testimony regarding the statements that Jessica and Marissa made to her that night were admitted for the limited purpose of showing that a complaint was made and the circumstances under which the complaint was made.  *See* RT 2408.

[20] In relevant part, the prosecutor argued the following in his rebuttal:

> You'll receive CALCRIM Jury Instruction Number 226 on witnesses.  It has a variety of factors on that instruction for you to take into consideration in evaluating testimony.  I'm not going to go through all.  I'm just going to go through a couple.
>
> You alone must judge the credibility or believability of the witnesses.  And one of the questions that that discusses is how reasonable is the testimony when you consider all

United States District Court
Northern District of California

was needed for conviction.  The prosecutor's statement regarding "one person's testimony" clearly referred to the testimony of Jessica and Marissa and accurately reflected the jury instructions that were given:

> The testimony of only one witness can prove any fact.  Before you conclude that the testimony of one witness proves a fact, you should carefully review all of the evidence.  Conviction of a sexual assault crime may be based on the testimony of a complaining witness.

RT 3068–69.  Later on in his rebuttal, the prosecutor clearly specified that Gardner's testimony was to be used in evaluating the credibility of Marissa and Jessica's testimony.  *See* RT 3309 ("Take [Gardner's demeanor during her testimony] when assessing the credibility of the witnesses. [Gardner's] telling the truth.") and 3312 ("It's for you to use [what Petitioner did to Gardner] in evaluating the testimony of Jessica and Marissa.").  The prosecutor's remarks accurately reflected the jury instructions and were not improper.  There was no prosecutorial misconduct.

### e.   Claim No. 17

Petitioner's entire statement of his seventeenth claim is as follows:

> The prosecutor Rolando Mazariegos committed perjury to the court with regard to evidence.

> The prosecutor stated to the court, "That I dissuaded Valerie Mason and instructed her to write a letter to the Contra Costa D.A.'s office to drop the case.  This in regards to the testimony of the prosecutors 1108 witness.  The prosecutor also stated that she (Valerie Mason) wrote a letter and pleaded with the Contra Costa D.A.'s office, and pleaded with them not to press charges.  Both of these statements were perjured.  (See page 1211 lines 9-13, and lines 22-25 of prosecutor misconduct and perjury).  Following page 1011 is the letter in question.

Pet. at 27.  Habeas relief is also denied for this claim.  Petitioner has provided no proof that the prosecutor's statements were false.  Nor does the record support Petitioner's claim.  Rather, the

---

the other evidence in the case.  Considering Krizia was sexually abused in 1987, Jessica was sexually abused in October 2008, Marissa was sexually abused in November '08, how reasonable is that testimony taken together?
Remember yesterday I said there was instruction where you could take one person's testimony, one single person's testimony, and convict the defendant on that.  That is one option.  The second option is you can take the whole totality of the circumstances and convict him that way.  Okay.  Ask yourself what was the witness's behavior while testifying?
RT 3305–06.

United States District Court
Northern District of California

record indicates that, at the time of the trial, Mason believed that Petitioner had molested Gardner and that Petitioner had not been held accountable for his actions.[21]  RT 3607 (Mason's statement at the sentencing hearing).  Also, the prosecution's characterization of Mason's 1987 letter was reasonable and did not constitute perjury.  Although Mason did not specifically ask the district attorney to drop the charges against Petitioner in the 1987 letter, she stated that she believed Gardner had falsely accused Petitioner.  It was reasonable to infer that Mason wrote this letter to dissuade the district attorney's office from filing charges against Petitioner.  Petitioner has incorrectly portrayed the prosecutor's statements as false.  There was no prosecutorial misconduct.

### f.      Claim No. 18

Petitioner's entire statement of his eighteenth claim is as follows:

> The prosecutor lead [sic] and assisted one of his witnesses, to commit perjury on the stand and coached her.
>
> When questioning Jessica . . ., the prosecutor asked her, "Were you laying on your back?"  Her response was, "My belly."
>
> The prosecutor then stated, "you were laying on your belly."  Who was on you --- if you were on your belly laying down in the living room -- .
>
> At this point, the witness interrupts the prosecutor and now states the [sic], "I was one my back."  The following 4 questions with exception of one, were all inclusive of term 'think back.'  Clearly the witness had understood and answered the question the first time when she was asked, "Were you laying on your back?", and she responded, "My belly."  (See page 2120, lines 6-21 of prosecutor misconduct and perjury).

Pet. at 28.  After carefully reviewing the relevant portion of Jessica's direct examination, the Court finds no misconduct.  There is nothing in the record that supports Petitioner's claim that Jessica lied when she stated that she was lying on her back when she was molested, nor is there any support for Petitioner's allegation that the prosecution coached Jessica to state that she was lying on her back.  The fact that a child witness initially misspoke, then corrected herself within seconds, in no way creates any inference of perjury.  This habeas claim is denied.

---

[21]  The prosecutor stated that Mason had informed an investigator in his office that Petitioner forced her to write the 1987 letter. RT 1222.  The record indicates that a Monterey County District Attorney's Office investigator interviewed both Gardner and Mason in June 2009. CT 78.  However, the transcripts of these interviews were not included in the record.

United States District Court
Northern District of California

### g.    Claim No. 19

Petitioner's entire statement of his nineteenth claim is as follows:

> The prosecutor lead [sic] and assisted one of his witnesses, to commit perjury on the stand and coached her.

> During continued questioning of the above witness/complainant, (Jessica . . .), the prosecutor asked "What time did she think it was when she incident [sic] had occurred." Her response was, "No." The prosecutor went on again to ask again, let me ask you again, because I don't know if you got my question. Do you remember what time it was." Her response was now, "Around 1:00. Yeah, around 1:00. Again, clearly the witness understood and answered the question the first time when asked. (See page 2121 of prosecutor misconduct and perjury)

Pet. at 28. There is nothing in the record that supports Petitioner's claim that Jessica lied when she stated that she found Petitioner next to her at 1:00 a.m., nor is there any support for Petitioner's allegation that the prosecution coached Jessica to make that statement. Jessica's initial answer did not respond to the question asked, and the prosecutor reasonably followed up to clarify. Accordingly, there was no prosecutorial misconduct. This habeas claim is denied.

### 3.    Additional Claims

### a.    Claim No. 20

Petitioner's entire statement of his twentieth claim is as follows:

> The trial court committed violations of the 5th, 6th, and 14th amendments of the U.S. constitution and denied my due process when it excluded evidence that defendant was investigated by the contra costa district attorneys office (Contra Costa), and law enforcement as to the allegations of the prosecutors 1108 witness, and that no charges were filed. (5 RT 1215)

Pet. at 28. Petitioner argues that the trial court's exclusion of the nonprosecution evidence violated both his Fifth Amendment and Fourteenth Amendment due process rights to a fair trial, as well as his Sixth Amendment right to present a defense. This habeas claim is without merit.

Whether grounded in the Sixth Amendment's guarantee of compulsory process or in the more general Fifth Amendment guarantee of due process, "the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (quoting *Crane v. Kentucky*, 476 U.S.

683, 690 (1986)).  However, the defendant's right to present evidence, however, is not absolute.  "In the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence."  *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973) (right to confront witnesses).  Even relevant and reliable evidence can be excluded when the state interest is strong.  *See Washington v. Texas*, 388 U.S. 14, 23 n.21 (1967) (attorney-client privilege).  "The court must give due weight to the substantial state interest in preserving orderly trials, in judicial efficiency, in excluding unreliable or prejudicial evidence."  *Perry v. Rushen*, 713 F.2d 1447, 1453 (9th Cir. 1983).

The Supreme Court has not addressed the issue of the admissibility of nonprosecution evidence.  However, the treatment of acquittal evidence in federal courts is instructive.  While the Supreme Court has not addressed the admissibility of such evidence, other federal courts have long held it to be hearsay inadmissible in federal prosecutions. *See United States v. Bisanti*, 414 F.3d 168, 172–73 (1st Cir. 2005) ("the fact of acquittal in a prior court proceeding involving similar subject matter is usually not admitted into evidence . . . because such acquittals are not generally probative of the defendant's innocence in the case at trial and the information has a tendency to confuse the jury rather than assist it") (internal citations omitted); *United States v. Gricco*, 277 F.3d 339, 353 (3d Cir. 2002) ("Judgments of acquittal, however, are still inadmissible in large part because they may not present a determination of innocence, but rather only a decision that the prosecution has not met its burden of proof beyond a reasonable doubt."), *overruled on other grounds, United States v. Cesare*, 581 F.3d 206, 208 n. 3 (3d Cir. 2009); *United States v. De La Rosa*, 171 F.3d 215, 219–220 (5th Cir.1999) (evidence of an acquittal is properly excluded as hearsay); *United States v. Thomas*, 114 F.3d 228, 250 (D.C. Cir. 1997) (evidence of judgments of acquittal are properly excluded as hearsay and also because "they generally are not relevant because they simply show that the government failed to prove guilt beyond a reasonable doubt); *United States v. Viserto*, 596 F.2d 531, 537 (2d Cir. 1979) (same).  In addition, one circuit court has found no

1    constitutional error in a state court's exclusion of acquittal evidence. *See Prince v.*

2    *Lockhart*, 971 F.2d 118, 122 (8th Cir. 1992) (in a habeas corpus action, finding that the

3    state court's exclusion of acquittal evidence after admitting evidence of the prior crimes

4    did not violate due process).

5            Similar to acquittal evidence, nonprosecution evidence is not probative of a

6    defendant's innocence in the case at trial.  In fact, nonprosecution evidence is even less

7    probative of innocence than acquittal evidence, because it introduces the additional

8    variable of what level and quality of investigation (if any) was conducted prior to the

9    decision.  Furthermore, nonprosecution evidence risks confusing a jury even more than

10   acquittal evidence, since the jury necessarily would be required either (1) to speculate as to

11   why charges were not filed; or (2) to hear potentially time-consuming and possibly

12   prejudicial evidence on that question.  In light of the absence of clearly established

13   Supreme Court precedent regarding nonprosecution evidence and the foregoing cases

14   concluding that evidence of a prior acquittal is not relevant or probative, this Court cannot

15   conclude that a state court's refusal to admit nonprosecution evidence is contrary to, or an

16   unreasonable application of clearly established federal law.

17           Moreover, even if exclusion of the nonprosecution evidence deprived petitioner of

18   a federally protected right, the error was harmless. As discussed *supra* in Section

19   III.D.1.d., there was significant direct and circumstantial evidence of Petitioner's guilt, in

20   the form of testimony from his victims and from Hernandez.  Under the facts and

21   circumstances of this case, the trial court's exclusion of the nonprosecution evidence did

22   not violate Petitioner's constitutional right to present a fair defense.  *Cf. Perry*, 713 F.3d at

23   1452–55 (exclusion of defendant's proffered evidence of third-party culpability did not

24   violate Sixth and Fourteenth Amendments where evidence was sufficiently collateral and

25   lacking in probity on the issue of identity and state had significant interest in avoiding

26   unsupported jury speculation).  This habeas claim is denied.

27                   **b.      Claim No. 21**

28           Petitioner's entire statement of his twenty-first claim is as follows:

United States District Court
Northern District of California

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> The trial court committed violations of the 5th, 6th, and 14th amendments of the U.S. constitution and denied my due process when it excluded the letter that was written by the mother of the 1108 witness of the prosecutor with regards to her allegations. (See letter under prosecutor misconduct and perjury).

Pet. at 28.  Similar to his prior claim, Petitioner appears to be arguing that the trial court's exclusion of Mason's 1987 letter to the Contra Costa County District Attorney's Office violated both his Fifth Amendment and Fourteenth Amendment due process rights to a fair trial, and his Sixth Amendment right to present a defense.  This habeas claim is also without merit.

Here, the trial court excluded the 1987 letter because it was hearsay.  The hearsay rule is long grounded in the notion that untrustworthy evidence should not be presented to the triers of fact.  *Chambers*, 410 U.S. at 298.  Thus, exceptions to allow admission of hearsay statements, such as declarations against interest, only apply to statements made under circumstances that tend to assure reliability and thereby compensate for the absence of the oath and opportunity for cross-examination.  *See id.* at 298–99.  In this case, the 1987 letter was far from trustworthy:  Mason was available and willing to testify that she disavowed that letter.  Accordingly, the trial court's exclusion of the 1987 letter did not violate Petitioner's constitutional rights under the Fifth, Sixth, or Fourteenth Amendment.

**E.      Certificate of Appealability**

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability.  *See* Rules Governing § 2254 Case, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard.  *Id.* § 2253(c)(3).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Here, Petitioner has not made such a showing, and, accordingly, a certificate of appealability will be denied.

## IV.  CONCLUSION

For the reasons stated above, the petition for a writ of habeas corpus is DENIED, and a certificate of appealability is DENIED.

The Clerk shall enter judgment in favor of respondent and close the file.

**IT IS SO ORDERED.**

Dated:  2/16/2016

_____
HAYWOOD S. GILLIAM, JR.
United States District Judge